SIMON & SCHUSTER, INC. and William
J. Bennett, Plaintiffs,

v.

DOVE AUDIO, INC., Defendant.

No. 95 Civ. 6012 (AGS).

United States District Court,
S.D. New York.

Aug. 29, 1996.

**158**

Kay Collyer & Boose, New York City, for Plaintiffs.

Kenneth David Burrows, New York City, Kaye, Scholer, Fierman, Hays & Handler, Los Angeles, California, for Defendant.

### OPINION AND ORDER

SCHWARTZ, District Judge.

Plaintiffs Simon & Schuster, Inc. (S & S) and William J. Bennett ("Bennett") bring this action alleging violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), as amended, common law trademark infringement and unfair competition, and violation of the New York state anti-dilution law, § 368–d of the New York General Business Law. This matter is before the Court upon the motion of defendant Dove Audio, Inc. ("Dove") for judgment on the pleadings, pursuant to Federal Rule of Civil Procedure 12(c). For the reasons that follow, defendant's motion is denied.

*BACKGROUND*

Plaintiffs' Complaint alleges the following facts, which, for purposes of ruling on this motion, are accepted as true.

In November 1993, plaintiff S & S published the hardcover book entitled *The Book of Virtues,* edited and with commentary by Bennett. Bennett developed the concept for *The Book of Virtues* series as a result of his extensive reading of ancient stories, fables, morality essays, and philosophical musings, together with his experience in public office, particularly as Secretary of Education under President Reagan. In Bennett's view, these materials provided an ideal means of teaching youth about virtue and morality.

Beginning in or around 1989, Bennett, individually and later with S & S, selected, compiled and annotated hundreds of these public domain pieces to "aid in the time-honored task of the moral education of the young," as the introduction to the book explains. As originally conceived, the working title for the first book in the series was *The Moral Literacy Reader: An American Parent's Guide to Ensure the Education of Character.* In early 1993, plaintiffs considered a number of other possible titles, including *Virtues Companions, Companions for Character* and, the title that was ultimately selected, *The Book of Virtues.*

*The Book of Virtues* has been a phenomenal success. As of August 9, 1995, the date of the Complaint, it had been on *The New York Times* Bestseller List for 86 consecutive weeks and sold more than 2.2 million hardcover copies. Following publication, Bennett promoted *The Book of Virtues* on such television programs as C–SPAN and ABC/TV's "Good Morning America" and appeared as a guest on a multitude of radio programs.

From the outset, Bennett and S & S intended to trade upon the success of *The Book of Virtues* by developing, publishing, and marketing other publications and products utilizing that name and mark, such as *The Children's Book of Virtues,* planned for publication in October 1995. Bennett envisioned a series of educational and trade materials to promote the development of "moral literacy." Plaintiffs' plans for *The Children's Book of Virtues* commenced almost simultaneously with publication of *The Book of Virtues.* This new title was publicly announced in the S & S catalog, available in April 1995 for fall release. Plaintiffs have expanded into the educational field, publishing a textbook entitled *The Book of Virtues for Young People.* "The Book of Virtues" mark has also been licensed to PorchLight Entertainment for television use. A public television series entitled *Further Adventures from the Book of Virtues* is scheduled for broadcast beginning in the Fall of 1996, and PorchLight has announced plans to develop *The Book of Virtues* into an interactive series, videotape collection and interactive media project aimed at children and families. Plaintiffs have expended or plan to expend over $1.3 million to promote print and audio products of *The Book of Virtues* series through wholesale and consumer trade channels.

Immediately upon completion of the first *The Book of Virtues,* plaintiffs began work on two subsequent print books in the series, *The Children's Book of Virtues* and *The Moral Compass,* which is to be sold and marketed as a companion book to *The Book of Virtues.* Plaintiffs have commenced marketing and

promoting these two books by capitalizing on the established consumer recognition of *The Book of Virtues*. In addition to print advertising, S & S will promote the series in a floor display that presents *The Children's Book of Virtues*, *The Book of Virtues*, and its companion piece, *The Moral Compass*.

Plaintiffs state that the theme and tone set by the mark "The Book of Virtues" has been systematically developed to acquire valuable trademark significance through their continued use of the mark on subsequent materials in the series, which currently includes books, audiobooks, compact discs, textbooks and an upcoming television series.

The success of *The Book of Virtues* has been reported in the press. A June 1995 *Newsweek* article stated that Bennett "hit a gusher" in his *The Book of Virtues*. On June 8, 1995, the *Washington Post* referred to the upcoming *The Children's Book of Virtues* as "Bennett's follow up to his mega-bestseller *The Book of Virtues*" and noted that sequels and spinoffs of *The Book of Virtues* had earned Bennett approximately $5 million. An article in the January 17, 1994 issue of *Publisher's Weekly* reported that nearly every bookseller surveyed mentioned *The Book of Virtues* as one of the most requested books of the season. *The Book of Virtues* was selected by the political commentary television program *The McLaughlin Group* as recommended reading by its five panelists, and was featured on a specially produced bookmark, which was distributed to 5,000 booksellers and libraries. *The Book of Virtues* was also used by Michael Huffington in his 1994 congressional bid. Huffington aired a 30–second commercial in every California market between February 11 and 18, 1994, which focused entirely on *The Book of Virtues* and its importance and relevance to American society. In addition, several parodies of *The Book of Virtues* have been published.[1]

Shortly after plaintiffs' publication of an audiobook version of *The Book of Virtues*, defendant Dove published and sold an audio-book entitled *The Children's Audiobook of Virtues*, as the first in a new Dove line called "Dove Kids" audiobooks. The subtitle of Dove's book is "A Library of Moral Learning"—which, plaintiffs contend, mimics and replicates the subtitle of plaintiffs' *The Book of Virtues*: "A Treasury of Great Moral Stories". Plaintiffs allege that Dove adopted a new logo for its "Dove Kids" audiobooks, which consists of a child in profile reading a book, and that this logo mimics the elements of the sole cover design on plaintiffs' *The Book of Virtues*.

Plaintiffs first learned of Dove's audiobook release in February 1995 through an advertisement in *Publisher's Weekly* and promptly demanded that Dove cease and desist from this allegedly infringing conduct and change the title of its book.[2] Thereafter, plaintiffs learned that Dove planned to publish its own print book entitled *The Children's Book of Virtues*, the identical title to plaintiffs' forthcoming book. An advertisement for that print book described it as "classic fairy tales, poems and myths to offer moral and inspirational messages." Plaintiffs strenuously objected to publication of Dove's print book.

Plaintiffs claim that the public is likely to be confused as to the origin or source of Dove's *The Children's Audiobook of Virtues* and print book *The Children's Book of Virtues*, mistakenly believing that the Dove publications are part of plaintiffs' *The Book of Virtues* series, when in truth and in fact they are not. Plaintiffs state that both defendant's and plaintiffs' books are in the same genre, are available in retail outlets throughout the country, are advertised and promoted in the same manner, are sold through the same marketing channels to the same wholesale customers, and appeal to the same readers. Further, plaintiffs' and defendant's publications are sold side by side in the same morality/philosophy sections of bookstores and are in approximately the same price range. Plaintiffs allege that Dove consciously imitated and copied plaintiffs' renowned mark in an attempt to trade upon and capi-

---

1. One such book is entitled *The Book of Bad Virtues:* A Treasury of Immorality.

2. Plaintiffs also allege that they have vigilantly policed their "The Book of Virtues" mark and have succeeded in preventing others from infringing thereon.

talize upon plaintiffs' good will, and that Dove's adoption of a logo that is similar to the cover design of plaintiffs' *The Book of Virtues* is likely to contribute to public confusion between the competing works.

Plaintiffs assert claims for relief under Section 43(a) of the Lanham Act, common law trademark infringement and unfair competition, and Section 368–d of the New York General Business Law. Following the commencement of this action, Dove consented to being preliminarily enjoined and restrained from the manufacture, publication, advertisement, distribution and sale of any audio and/or print books under the title(s) *The Children's Audiobook of Virtues* and/or *The Children's Book of Virtues*, or any other title confusingly similar to plaintiffs' title and alleged trademark "The Book of Virtues", conditioned on plaintiffs' posting a $500,000 bond. Defendants, however, deny liability under plaintiffs' claims. Defendants have moved for judgment on the pleadings, pursuant to Federal Rule of Civil Procedure 12(c), on the grounds that (1) plaintiffs' mark is generic and therefore not entitled to protection under the Lanham Act, (2) alternatively, plaintiffs' mark is descriptive and lacks secondary meaning, and (3) the finding of a likelihood of confusion must be, and is not, particularly compelling to outweigh defendant's First Amendment interest in utilizing its chosen titles. Plaintiffs take the position that their alleged "The Book of Virtues" mark is suggestive, not generic, and that plaintiffs have sufficiently pleaded secondary meaning of the mark and a likelihood of confusion between the parties' titles.

*DISCUSSION*

■ On a Rule 12(c) motion, Dove is entitled to judgment on the pleadings "only if it has established that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." *Juster Assocs. v. Rutland,* 901 F.2d 266, 269 (2d Cir.1990) (internal quotations and citations omitted). Moreover, the Court must view all facts and allegations in the Complaint in the light most favorable to plaintiffs. *Id.*

*I. Protectability of the Mark*

Section 43(a) of the Lanham Act proscribes "false designation of origin, or any false description or representation" in relation to goods or services. 15 U.S.C. § 1125(a). This section is the only provision in the Lanham Act that protects an unregistered mark. *Centaur Communications, Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1220 (2d Cir.1987). Its purpose is "to prevent consumer confusion regarding a product's source and to enable those that fashion a product to differentiate it from others on the market. In that way producers create goodwill with consumers." *Id.* (citations omitted).

■ Dove contends that plaintiffs cannot prevail on their Lanham Act claim because their alleged mark "The Book of Virtues" is generic. Plaintiffs take the position that their mark is suggestive, or at the very least descriptive and secondary meaning has been adequately alleged. Where, as here, the mark has not been registered, plaintiffs bear the burden of showing that the mark is not generic. *Reese Publishing Co., Inc. v. Hampton Int'l Communications, Inc.,* 620 F.2d 7, 11 (2d Cir.1980).

■ There are four different categories of terms with respect to trademark protection. "Arrayed in an ascending order which roughly reflects their eligibility to trademark status and the degree of protection accorded, these classes are (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful." *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976). A generic term is "one that refers, or has come to be understood as referring, to the genus of which the particular product is a species," *id.,* such as "soap", "cereal" or "automobile". *See Gruner † Jahr U.S.A. Publishing v. Meredith Corp.,* 991 F.2d 1072, 1075 (2d Cir. 1993) ("A generic term is a common name, like automobile or aspirin, that describes a kind of product"). In *Abercrombie & Fitch,* the court gave the following example: " 'Ivory' would be generic when used to describe a product made from the tusks of elephants but arbitrary as applied to soap." 537 F.2d at 9 n. 6. A generic term is not subject to trademark protection for the logical reason

that, if it were, "this in effect would confer a monopoly not only of the mark but of the product by rendering a competitor unable effectively to name what it was endeavoring to sell." *Id.* at 10; *see also Girl Scouts v. Bantam Doubleday Dell Publishing Group, Inc.,* 808 F.Supp. 1112, 1124 n. 18 (S.D.N.Y. 1992), *aff'd,* 996 F.2d 1477 (2d Cir.1993) ("It would be difficult to write about a children's youth organization engaged in activities like sports, crafts, and helping others, and to attain the reading audience's near-universal recognition of the book's subject, without using the term 'scout.'")

In contrast, a descriptive term conveys an immediate idea of the ingredients, qualities or characteristics of the goods, and is eligible for trademark protection if it has "become distinctive of the applicant's goods in commerce," 15 U.S.C. § 1052(f), or, in other words, if it has acquired secondary meaning. *Girl Scouts,* 808 F.Supp. at 1123. Whereas, "[a] term is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of goods." *Abercrombie & Fitch,* 537 F.2d at 10. Ordinarily, a suggestive mark is entitled to trademark protection without any showing of secondary meaning because it is inherently distinctive; however, the Second Circuit has applied a more stringent rule to literary titles, requiring the trademark owner to demonstrate secondary meaning regardless of the suggestive nature of the title. *Twin Peaks Productions, Inc. v. Publications Int'l, Ltd.,* 996 F.2d 1366, 1378 n. 4 (2d Cir.1993). A showing of secondary meaning cannot, in any event, transform a generic term into a protectable trademark. *Reese Publishing Co.,* 620 F.2d at 12.

Dove argues that books of virtues, of which plaintiffs' book is one, have been a literary convention since the days of St. Thomas Aquinas and his published work "Of Virtues." Included in this "genus", defendant suggests, are works such as Plato's "Apology", John Milton's "Areopagitica", Immanuel Kant's "Critique of Practical Reason" and "Metaphysical Elements" (chapter XIV of which is entitled "Of Virtues"), as well as the Bible and The Book of Mormon. Dove claims that plaintiffs' and defendant's titles—

"The Book of Virtues", "The Children's Audiobook of Virtues" and "The Children's Book of Virtues"—precisely describe the contents of the works, as various species of the genus referred to above.

Dove refers the Court to the Second Circuit's decision in *Reese Publishing Co. v. Hampton Int'l Communications, supra,* in which the court found the title "Video Buyer's Guide" to be generic as applied to a publication that reported on and promoted the sale of video products. Similarly, in *CES Publishing Corp. v. St. Regis Publications, Inc.,* 531 F.2d 11 (2d Cir.1975), the court determined that the title "Consumer Electronics Monthly" was not a protectable trademark because "consumer electronics" was a generic term describing consumer electronic products and was the name of a trade or industry. The *CES* court observed that

> it is hard to think of a name for a magazine, directed deliberately and effectively to industry personnel which more accurately names the class of trade magazines within that industry than one which simply gives itself the name of the trade plus the word "Monthly."

531 F.2d at 14. Dove also relies on an unpublished decision in *Dell Publishing Co. v. Banner Press, Inc.,* No. 81 Civ. 7349, 1982 WL 772 (S.D.N.Y. Dec. 31, 1982), in which the court found that defendant's use of the title "Super Word Search" for its book of word search puzzles did not infringe the plaintiff's trademark "Word Search Puzzles" because "[t]he law would not allow plaintiff to prevent defendant from calling a crossword puzzle a 'crossword puzzle' or a trash bag a 'trash bag.'" *Id.* at *1–2.

Defendant further points out that, according to its research, there are no fewer than 56,266 titles containing the word "book" and 532 titles containing the word "virtue", in its singular or plural form. Moreover, since 1972, at least 1,493 titles have been published beginning with the phrase "The Book of ..." and at least 44 of those titles contain the word "virtue".

The Court finds that "The Book of Virtues" mark does not fall into the generic category alongside "Video Buyer's Guide",

"Consumer Electronics Monthly" or "Word Search Puzzles". Dove would have the Court equate "The Book of Virtues" with titles such as "The Book of Fables" or "The Book of Short Stories with a Morality Message". A consumer would only need ask "which fables?" or "whose short stories?" to glean the exact contents of books with these generic titles. Terms such as "short story", "fable" and "word search" refer to exactly that which is contained in the work, and anyone publishing the same type of work would be at a disadvantage in describing its product if such terms were protectable. In contrast, the title "The Book of Virtues" tells something about the product—"its qualities, ingredients or characteristics," *Abercrombie & Fitch*, 537 F.2d at 9, or in this case its theme; however, the title does not describe exactly the contents of *The Book of Virtues*,[3] or how this theme will be developed and communicated. Moreover, this title is hardly the only way to describe a collection of stories designed to teach morality, as defendant's list of titles in this "genus" readily demonstrates, *see supra* at 161.

■ Furthermore, defendant's research showing that there are numerous titles with the words "book", "the book of" and/or "virtue(s)" is unavailing. The Court must evaluate plaintiffs' mark as a whole, not dissect it into individual words that might, taken alone, be common or generic. *See Blinded Veterans Ass'n v. Blinded Am. Veterans Foundation*, 872 F.2d 1035, 1041 (D.C.Cir.1989); *Girl Scouts*, 808 F.Supp. at 1124; *Inc. Publishing Corp. v. Manhattan Magazine, Inc.*, 616 F.Supp. 370, 379 (S.D.N.Y.1985), *aff'd*, 788 F.2d 3 (2d Cir.1986).

■ Plaintiffs submit that "The Book of Virtues" is a suggestive mark. Such a mark suggests, or conveys an impression of the product, though it may take imagination to grasp the nature of the product. *Gruner † Jahr*, 991 F.2d at 1076. Examples of suggestive marks are "Orange Crush", *id.*, "Roach Motel", *American Home Prods. Corp. v.*

*Johnson Chem. Co., Inc.*, 589 F.2d 103 (2d Cir.1978), and "Q–Tips", *Q–Tips, Inc. v. Johnson & Johnson*, 206 F.2d 144 (3d Cir.), *cert. denied*, 346 U.S. 867, 74 S.Ct. 106, 98 L.Ed. 377 (1953).

However, the Court finds that "The Book of Virtues" mark does not rise to this level of protection, but rather falls into the category of descriptive marks. As noted above, the title conveys an idea of the ingredients, qualities or characteristics of the product. That is, a consumer knows by the mark that the product is a book having something to do with virtue of some sort, much the way that a consumer would understand that *Parents* is a publication having to do with parenting. *See Gruner † Jahr, supra* (finding "Parents" a descriptive mark).

## II. Secondary Meaning

Defendant argues that even if plaintiffs' mark is descriptive, rather than generic, it has not achieved secondary meaning. Plaintiffs contend that they have adequately pleaded secondary meaning, which is a question of fact not properly determined upon the pleadings.

A descriptive term is subject to protection under section 43(a) of the Lanham Act only if the proponent of protection demonstrates that, in addition to the ordinary common meaning of the words, the term has acquired a secondary meaning in its particular market. *Bristol–Myers Squibb Co. v. McNeil—P.P.C., Inc.*, 973 F.2d 1033, 1040 (2d Cir. 1992). A descriptive term acquires secondary meaning when

> it is shown that the *primary* significance of the term in the minds of the consuming public is not the product but the producer. Thus, the crux of the doctrine of secondary meaning is that the mark comes to identify not only the goods but the source of those goods, even though the relevant consuming public might not know the name of the producer.

---

**3.** Plaintiffs point out that *Webster's Third New International Dictionary* contains eight distinct definitions for the term "virtue", including "supernatural power or influence exerted by a divine being", "the chastity of a woman", "manly strength or courage", "a particular beneficial quality or efficacy in something", and "moral practice or action". Plaintiffs' Mem. of L. at 12. A book entitled "The Book of Virtues" could be, among other things, a story or a collection of stories on the topic of any one of these distinct definitions.

*Centaur Communications,* 830 F.2d at 1221 (internal quotations and citations omitted) (emphasis in original).

■ Secondary meaning in a literary title occurs "when the title is sufficiently well known that consumers associate it with a particular author's work"—in this case, plaintiff Bennett. *Tri–Star Pictures, Inc. v. Leisure Time Productions, B.V.,* 749 F.Supp. 1243, 1252 (S.D.N.Y.1990), *aff'd,* 17 F.3d 38 (2d Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 484, 130 L.Ed.2d 396 (1994). Where the title of a book has acquired secondary meaning, the holder of the rights to that title may prevent the use of the same title or a confusingly similar title by other authors. *Rogers v. Grimaldi,* 875 F.2d 994, 998 (2d Cir.1989).

■ The Second Circuit has identified the following six elements a court should evaluate in determining the existence of secondary meaning: (1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use. *Id.* at 1222. However, it is important to recognize that no single factor is determinative and every element need not be proved. *Id.*

■ The Complaint contains well pleaded facts supporting four of these six elements, which facts must be viewed in the light most favorable to plaintiffs. Plaintiffs allege that they have expended or earmarked more than $1.3 million to advertise, market and promote "The Book of Virtues" print and audio products. Media coverage of the work includes articles in *Newsweek, Washington Post,* and *Publisher's Weekly,* as well as mention on *The McLaughlin Group* television program and in a campaign advertisement of Congressional candidate Michael Huffington. Plaintiffs allege that *The Book of Virtues* has been a phenomenal success, remaining on *The New York Times* Bestseller List for 86 consecutive weeks and selling over 2.2 million hardcover copies as of the filing of the Complaint. Plaintiffs state that they have vigilantly policed their mark and have succeeded in preventing others from infringing thereon. Moreover, if the Court finds that defendant intentionally copied plaintiffs' mark, as plaintiffs allege, this would be persuasive, if not conclusive, evidence of consumer recognition and goodwill. *Centaur Communications,* 830 F.2d at 1224.

Plaintiffs need not prove secondary meaning at this stage of the litigation. Although, ultimately, plaintiffs bear the burden of doing so, secondary meaning is "an essentially *factual* determination, proof of which entails vigorous *evidentiary* requirements." *Bristol–Myers Squibb,* 973 F.2d at 1041 (emphasis supplied). For example, a consumer study linking the mark to its source is an element that would be developed, if at all, during discovery of this action. Thus, a finding that "The Book of Virtues" mark lacks secondary meaning, based exclusively on the pleadings, would be premature, if not incorrect.

### III.   The First Amendment and Application of the Polaroid Factors

Defendant argues that since this action concerns the title of an artistic work, the finding of likelihood of confusion must be particularly compelling to outweigh the First Amendment interest, and that, as a matter of law, plaintiffs cannot meet this heightened standard.

■ The key element that plaintiffs must prove in order to succeed on their Lanham Act claim is that there is a likelihood of confusion between their product and defendant's or, in other words, "that numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of defendant's mark." *Gruner † Jahr,* 991 F.2d at 1077. The factors to be weighed in determining the likelihood of confusion are the familiar *Polaroid* factors, which are: (1) the strength of plaintiffs' mark, (2) the similarity of plaintiffs' and defendant's marks, (3) the competitive proximity of the products, (4) the likelihood that plaintiffs will "bridge the gap" and offer a product like defendant's, (5) actual confusion between the products, (6) good faith on the defendant's part, (7) the quality of defendant's product, and (8) the sophistication of

buyers. *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). These factors are not dispositive, and additional factors may be considered or initial factors abandoned. *See id.* at 495. "While the ultimate weighing of these factors is determined by the trial court as a matter of law ..., resolution with respect to each separate factor is a factual finding...." *Gruner " Jahr,* 991 F.2d at 1077.

■ The Second Circuit has stated that "in general the [Lanham] Act should be construed to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression." *Rogers v. Grimaldi,* 875 F.2d at 999. Thus,

> [b]ecause of an author's significant First Amendment interest in choosing an appropriate title for his or her work, ... literary titles do not violate the Lanham Act "unless the title has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the title explicitly misleads as to the source or the content of the work."

*Twin Peaks,* 996 F.2d at 1379 (quoting *Rogers v. Grimaldi,* 875 F.2d at 999).[4]

■ In this case, there is no question that defendant's title is of some artistic relevance to its book. The question then is whether Dove's title is misleading "in the sense that it induces members of the public to believe the [b]ook was prepared or otherwise authorized by [plaintiffs]." *Twin Peaks,* 996 F.2d at 1379. This determination must be made by application of the *Polaroid* factors; however, the finding of likelihood of confusion must be "particularly compelling to outweigh the First Amendment interest recognized in *Rogers." Id.*

Based on the parties' pleadings and motion papers, the only record in this case thus far, the Court cannot find that, as a matter of law, plaintiffs will be unable to make a particularly compelling showing of likelihood of confusion. Such a finding is more appropri-

ately made on a motion for summary judgment or at trial. Plaintiffs have sufficiently pleaded facts in support of a number of *Polaroid* factors, which facts must be viewed in the light most favorable to plaintiffs on this Rule 12(c) motion.

First, as noted above, plaintiffs have adequately pleaded secondary meaning of their descriptive mark, which goes to the strength of the mark, the first *Polaroid* factor. *See Centaur Communications,* 830 F.2d at 1225 ("the strength of a mark is its tendency to identify the goods sold as emanating from a particular source, even when the source is unknown to the consumer"). Second, there is obvious similarity between plaintiffs' mark "The Book of Virtues" and the titles of defendant's disputed publications: "The Children's Audiobook of Virtues" and "The Children's Book of Virtues". In addition, plaintiffs have alleged that defendant's subtitle and logo mimic plaintiffs' subtitle and cover design. Third, plaintiffs have alleged that the competing products are sold through similar distribution channels to similar markets. With respect to the fourth *Polaroid* factor—the likelihood that the senior user will bridge the gap by entering the market in which the junior user operates—plaintiffs already compete with defendant in the children's book market and they clearly intend to do so in the future.

Defendant makes much of the fact that the Complaint fails to allege survey evidence of actual confusion between the parties' products. Dove cites, *inter alia, Girl Scouts v. Bantam Doubleday Dell Publishing, supra,* for the proposition that "[i]t may be proper for a court to infer from the absence of proof of actual confusion that there is no likelihood of confusion." 808 F.Supp. at 1127. However, in *Girl Scouts,* the court ruled in favor of the defendant on a motion for summary judgment, where the parties had ample time to develop the record. There is no requirement that plaintiffs file their action with survey evidence in hand. At this early stage of the

---

**4.** Plaintiffs argue that this heightened standard applies only in the case of parodies, as in *Twin Peaks,* or study guides, as in *Cliffs Notes, Inc. v. Bantam Doubleday Dell Publishing Group, Inc.,* 886 F.2d 490 (2d Cir.1989), where the alleged infringer must, of necessity, refer to the mark in question. The Court rejects this limitation on the holding of *Rogers v. Grimaldi* and its progeny.

litigation, the lack of survey evidence showing actual confusion cannot be dispositive.

Finally, plaintiffs allege that Dove acted in bad faith in consciously imitating plaintiffs' well known "The Book of Virtues" mark in order to capitalize on plaintiffs' good will. In sum, taking plaintiffs' well pleaded allegations as true and all reasonable inferences to be drawn therefrom, the Court is not convinced, at this early stage of the litigation, that plaintiffs will be unable to make a particularly compelling showing of a likelihood of confusion between the works in dispute. Accordingly, Dove's motion for judgment on the pleadings must be denied.[5]

*CONCLUSION*

For the reasons stated above, defendant's motion for judgment on the pleadings, pursuant to Federal Rule of Civil Procedure 12(c), is denied. Counsel are directed to appear for a pre-trial conference at the United States Courthouse, Courtroom 14C, 500 Pearl Street, New York, New York on September 30, 1996 at 9:45 a.m. for the purpose of scheduling further proceedings in this action.

SO ORDERED.

---

**5.** Dove also moves for judgment as to plaintiffs' state law claims. Dove's arguments for dismissing plaintiffs' anti-dilution and unfair competition claims are similar to its arguments for dismissing plaintiffs' Lanham Act claim. *See* Defendant's Mem. of L. at 28 ("Obviously plaintiffs cannot prevail under this [anti-dilution] standard unless they also prevail on their Lanham Act claims—which, as noted *supra*, plaintiffs cannot do"). For the reasons noted in the body of this Opinion and Order, the Court determines that it would be premature to find for defendant on plaintiffs' state law claims as well.